UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER R. ROSS, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 1:13CV1515 |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE GEORGE J. |
| CAROLYN W. COLVIN[1], | ) | LIMBERT |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | MEMORANDUM OPINION AND ORDER |
| | ) | |
| Defendant. | ) | |

Jennifer R. Ross ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying her application for Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the Commissioner's decision is affirmed and Plaintiff's complaint is dismissed with prejudice:

**I.** **PROCEDURAL AND FACTUAL HISTORY**

On December 29, 2009, Plaintiff applied for SSI, alleging disability beginning June 1, 2001. ECF Dkt. #13 ("Tr.") at 146, 242. The SSA denied Plaintiff's application initially and on reconsideration. Tr. at 146-147. Plaintiff requested an administrative hearing, which was held on June 22, 2011. Tr. at 73-112. At the hearing, the ALJ accepted the testimony of Plaintiff, who was represented by counsel, and Thomas Nimberger, a vocational expert ("VE"). Plaintiff amended her alleged onset date to December 29, 2009 at the hearing. Tr. at 77-78. On October 20, 2011, the ALJ issued a Decision denying benefits. Tr. at 151-159. Plaintiff filed a request for review, which the Appeals Council denied on May 15, 2013. Tr. at 1-7.

On July 12, 2013, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On October 27, 2013, Plaintiff filed a brief on the merits. ECF Dkt. #18. On December 3, 2013,

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

with leave of Court, Defendant filed a brief on the merits. ECF Dkt. #20. A reply brief was filed on December 17, 2013. ECF Dkt. #21.

## II. SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

The ALJ determined that Plaintiff, who was forty-three years of age on the alleged onset date, and forty-five years of age at the hearing, suffered from chronic obstructive pulmonary disease ("COPD"), status post infarc[tion]-resolved, degenerative disc disease, vertigo, anxiety, depression, and borderline intellectual functioning, which qualified as severe impairments under 20 C.F.R. §416.920(c). Tr. at 153. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§416.920(d), 416.925 and 416.926 ("Listings"). Tr. at 153-154.

Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform less than a full range of sedentary work, as defined by 20 C.F.R. 416.967(a), that is, she can lift or carry up to ten pounds occasionally and five pounds frequently; she can sit for eight hours in an eight-hour workday; she can stand or walk for three hours in an eight-hour workday, but only for fifteen minutes at a time; she can frequently push, pull, and handle, she can only occasionally bend; she can perform simple, repetitive tasks, which involve few changes and limited interaction with others; and her work environment must be free from strict production quotas. Tr. at 155.

The ALJ ultimately concluded that, although Plaintiff could not perform her past work, which was at the light or medium exertional level, she is able to perform the representative occupations of polisher, sorter, and final assembler, optical. As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

## III. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

    2.    An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

    3.    If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

    4.    If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

    5.    If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the

-3-

record upon which the ALJ could have found plaintiff disabled.  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001).  However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## V.  ANALYSIS

Plaintiff advances two arguments in this appeal.  First, Plaintiff contends that the ALJ violated the treating physician rule when she did not give controlling weight to the opinion of Samar el-Sayegh, M.D., who asserted that Plaintiff would be absent from work at least three days per month.  Second, Plaintiff contends that the ALJ erred when she did not give proper consideration to the disability determination made by the Ohio Department of Job and Family Services ("ODJFS").

### A.  Medical evidence

On August 29, 2008, a CT scan of Plaintiff's brain revealed a non-enhancing low density area of left frontal lobe, most likely representing a remote infarction or area of remote brain trauma. Tr. at 448.  On September 2, 2008, an MRI of the brain interpreted by Alison Pryce, M.D., revealed an abnormality in the left frontal lobe predominantly within the white matter, but did involve the cortex, with slight mass effect on the body of the left lateral ventricle, and was felt to most likely represent a subacute infarction of the left anterior cerebral artery territory. Tr. at 446. Further, there were white matter changes indicating additional areas of small vessel ischemic change. Tr. at 446.

Plaintiff was evaluated on September 26, 2008, by board certified neurologist, Gary R. Kutsikovich, M.D., regarding what he characterized as "her recent stroke." Tr. at 459. Plaintiff described her history of right-sided symptoms, of numbness and weakness primarily in her legs, headaches, and occasional dizziness. Tr. at 459. Although she reported improvement in her symptoms since their onset about a month prior, her reflexes were decreased at two of four in both upper and lower extremities. Tr. at 459. He noted the location of infarction shown on the MRI correlated with her symptoms of right leg weakness and numbness. Tr. at 460. Dr. Kutsikovich

-4-

prescribed daily aspirin therapy and scheduled a repeat study to evaluate any interval change. Tr. at 460.

On October 9, 2008, Dr. Kutsikovich noted that a repeat MRI showed a resolving left subacute ischemia in the left frontal lobe. Tr. at 458. Plaintiff underwent an ultrasound of the carotids which showed mild carotid artery disease of less than fifty percent bilaterally, with pain in the vertebral arteries and with left and right subclavian stenosis of fifty to seventy-five percent. Tr. at 458, 482. Dr. Kutsikovich's impression was subacute left frontal lobe infarction, which appeared to be improving, but required follow-up studies. Tr. at 458.

An MRI on November 25, 2008 revealed interval development of encephalomalacia in the anterior body of the corpus callosum, and persistent small foci of cortical enhancement, which were likely the sequelae of a prior ischemic event, as well as, nonspecific foci of subcortical white matter changes. Tr. at 481. She was doing well on the next two follow-up appointments, and an MRI of the brain on March 24, 2009 revealed interval progression of the remote ischemic change and resolution of the abnormal enhancement. Tr. at 455, 480. Nonetheless, on April 17, 2009, Plaintiff reported occasional paresthesia of the left hand. Tr. at 454.

Plaintiff was seen by Daniel Hofius, D.O. on May 26, 2009, with complaints of swelling in both legs and numbness in the left arm. Tr. at 640. On examination, she had +1 to 2/4 edema of the bilateral lower extremities, but no erythema. Tr. at 640. She was diagnosed with cubital tunnel syndrome. Tr. at 640. In June of 2009, she was treated for left otitis media and lumbar sprain. Tr. at 638.

On September 24, 2009, Plaintiff reported depression and anger problems to Daniel Modarelli, D.O. as well as pain in the back of the head/neck area. She also complained of recurring diarrhea that had been present for a long time. Tr. at 635. She was treated for chronic diarrhea, depression, and chronic neck pain, with prescriptions for Zoloft and Ibuprofen Tr. at 635. On September 25, 2009, she was seen by Dr. Hofius for complaints of facial problems and treatment for influenza. Tr. at 646. On October 15, 2009, Plaintiff reported she had stopped Zoloft due to having chest tightness and cough, and she was started on Lexapro for depression.

Plaintiff was seen at Memorial Hospital of Geneva in the Emergency Medical Services on October 3, 2009, with complaints of rapid heartbeat. Tr. at 533. The assessment was palpitations likely due to medication side effect to Zoloft. Tr. at 536, 542. An EKG showed inferior infarction, age undetermined. Tr. at 539. She was prescribed Vistaril to address palpitations in the future. Tr. at 542.

Plaintiff received refills of Lexapro on November 9, 2009, when she was treated for left otitis media. Tr. at 633. On November 30, 2009, she was treated bilateral serous otitis media. Tr. at 632. Plaintiff was seen by Dr. Hofius on December 17, 2009, with complaint of back pain for several days after lifting boxes the previous week. Tr. at 631. The assessment was lumbosacral sprain with tenderness and spasms noted in the lumbar area. Tr. at 631. She received an injection of Toradol and prescription for Flexeril.  Tr. at 631.

On December 20, 2009, Plaintiff returned to the emergency room with complaints of back pain, which had started in the past week after she had been active getting ready for Christmas. Tr. at 510. She rated her pain as severe at nine out of ten on the pain scale. Tr. at 509, 510. Dr. Hofius had prescribed Flexeril and Ultram earlier in the week, but she said it was not helping. Tr. at 510. Christian Halloran, M.D., prescribed Percocet for her acute low back pain and also diagnosed a fever of unknown origin. Tr. at 510. Discharge instructions included a restriction against lifting anything over fifteen pounds until all pain subsided. Tr. at 517.

Plaintiff was consultatively examined by Richard Halas, M.A., on February 26, 2010, at which time she related being held back twice in elementary school, before being placed in special education classes, and always maintaining below average grades. Tr. at 711. Her most recent employment was working as a dishwasher at LaMofta Party Center.  She reported that, after two weekends, she was terminated because she was too slow. Tr. at 712. She had three daughters, ages fourteen, seventeen, and nineteen. Tr. at 711.

Dr. Halas noted that at the time of the interview, Plaintiff was disheveled and unkempt. Tr. at 712. Her grooming was assessed as being poor and below average. Tr. at 712. She was cooperative and appropriately motivated, but she related in a rather flat, tense, and anxious way. Tr. at 712. Her speech pattern was slow, hesitant, and constricted, with short, specific, goal-oriented

-6-

answers. Tr. at 712. She had significant poverty of speech and amount of eye contact was poor, looking down instead of at the examiner. Tr. at 713. She was frequently tearful during the interview and she reported crying spells. Tr. at 713. Her affect was flat and shallow, and her mood reflected depression, though she denied any thoughts of hurting herself or others. Tr. at 713. Her psychomotor activity was reflected retardation. Tr. at 713. She generally showed a relatively high level of anxiety and was prone towards fidgeting. Tr. at 713. Her hands trembled while extended in front of her, and were damp and cold at the conclusion of the appointment. Tr. at 713.

Dr. Halas opined that Plaintiff seemed tense, anxious, and apprehensive, but not specifically phobic. Tr. at 713. She had no history of hallucinations or paranoid ideations. Tr. at 713. She was reasonably well-oriented to time, place, and person, but her memory for past events was limited. Tr. at 714. Her short-term memory functioning levels were below average as she was able to recall two of three items after five minutes. Tr. at 714. She could do simple calculations, but was unable to do serial sevens; her thinking was far more concrete than abstract; she could not understand two simple proverbs; and her concentration skills were limited to four digits forward. Tr. at 714. Her general intelligence level was estimated to be in the extremely low range. Tr. at 714.

Dr. Halas administered a Wechsler Adult Intelligence Scale-Fourth Edition on which the claimant obtained a verbal comprehension index of 61, a perceptual reasoning index of 58, a working memory index of 60, a processing speed index of 62, and a full scale IQ of 54. Tr. at 717. These scores were considered valid and placed Plaintiff within the extremely low range of intelligence. Tr. at 714. Her concentration skills were significantly below average as was current fund of information. Tr. at 714. These scores were indicative of both valid and accurate measure of her true overall long-term functioning and academic potentialities and were consistent with her previous academic backgrounds, school failures, and placement in special classes. Tr. at 714.

Dr. Halas' diagnoses were depressive disorder, anxiety disorder, dementia, and borderline intellectual functioning. Tr. at 715. He specifically noted she was not being given the diagnosis of mild mental retardation because she had passed a driver's license test and worked competitively in the past. Tr. at 715. He assessed a Global Assessment of Functioning ("GAF") score of 45, indicative of serious symptoms. Tr. at 715.

-7-

Following the consultative examination in February of 2010, Dr. Halas assessed Plaintiff's work-related mental abilities as follows: He concluded that Plaintiff had a marked impairment in her ability to understand, remember, and follow instructions; a marked impairment in ability to maintain attention and concentration to perform simple, repetitive tasks; a marked impairment ability to relate to others, including fellow workers and supervisors; and a marked impairment in ability to withstand the stresses and pressures associated with most day-to-day work. Tr. at 716. Dr. Halas further opined that Plaintiff's psychological and emotional problems would likely become quickly exacerbated under the pressures of a normal work setting. Tr. at 716.

Plaintiff was seen by John Baron, M.D., on May 17, 2010, with complaints of chronic cough and shortness of breath, and dyspnea on moderate exertion. Tr. at 881. She weighed 234 pounds. Tr. at 881. On May 24, 2010, Plaintiff underwent pulmonary function studies due to chronic cough at which time she was 67 inches tall and weighed 232 pounds. Tr. at 866. Forced expiratory volume in one second was 1.76L or 55% of predicted, and the forced expiratory volume in one second/forced vital capacity ratio was decreased. Tr. at 866. There was no significant response to bronchodilators and her total lung capacity was moderately reduced. Tr. at 866.

The foregoing results were interpreted as showing a moderate mixed ventilator impairment, with the restrictive component being moderate and in a pattern suggestive of obesity-related restriction. Tr. at 867. The findings were consistent with diagnosis of chronic obstructive pulmonary disease or possible concomitant restrictive process. Tr. at 867. Dr. Baron prescribed Advair, Albuterol, and Nicotine patches to help her stop smoking. Tr. at 878.

Plaintiff was seen by Raimantas Drublionis, M.D. at the Geneva Clinic on July 20, 2010, with complaints of malaise, fatigue, tiredness, weakness, chronic obstructive pulmonary disease, depression, dyslipidemia, and history of cerebrovascular accident/mini-stroke. Tr. at 911. She reported urinary incontinence and severe back pain. Tr. at 911. On examination, she had lumbar spine tenderness. Tr. at 911. Dr. Drublionis increased her Lexapro for depression, and prescribed VESIcare for urinary incontinence, as well as Advair/Ventolin for chronic obstructive pulmonary disease. Tr. at 911.

Plaintiff was treated in the emergency room on August 6, 2010, for complaints of back pain, with x-rays showing degenerative osteophytes at the mid and lower thoracic vertebral body end plates. Tr. at 826, and degenerative changes in the lumbar spine with loss of disc height at L4-5. Tr. at 827.

Plaintiff sought counseling services on September 13, 2010, due to depression related to the financial stress on losing her daughter's disability benefits as a source of income. Tr. at 927. Her youngest daughter had moved in with one of Plaintiff's friends. Tr. at 927. She presented with blunted affect, minimal eye contact, and she was hesitant to answer some questions, but willing to answer most. Tr. at 927. On September 27, 2010, she reported she had moved into her father's house and she had a full affect and good eye contact. Tr. at 926.

On September 28, 2010, Dr. Drublionis, M.D., conducted a complete physical examination and complete medical records review at the request of the Ashtabula County Department of Job and Family Services. Tr. at 745. On examination, Plaintiff was 5'7" tall and weighed 222 pounds; her back had restricted range of motion; and she had lumbar tenderness. Tr. at 745. Dr. Drublionis listed her medical conditions to include depression, dyslipidemia, spine degenerative disc disease (thoracic spine and lumbar spine); urinary incontinence; chronic obstructive pulmonary disease; allergies; sciatica; insomnia; metabolic syndrome; and insulin resistance. Tr. at 745. Her medications included Lexapro, aspirin, VESIcare, Advair, Ventolin, Naproxen, Allegra, Vicodin, Lovastatin, and Ambien. Tr. at 745.

Dr. Drublionis went on to assess her physical functional capacity as follows: the ability to stand/walk about two to three hours in an eight-hour workday, but for no more than fifteen to twenty minutes at a time without interruption; the ability to lift up to five pounds frequently and ten pounds occasionally; a markedly limited ability to bend; and a moderately limited ability to push/pull or reach. Tr. at 746.

On October 13, 2010, Plaintiff underwent a psychiatric evaluation by treating physician, Dr. El-Sayegh, at which time she reported experiencing severe depression over the last year. Tr. at 923. Her medications were Lexapro, VESIcare, Advair, Lovastatin, Baby Aspirin, and Vicodin Tr. at 923. Plaintiff had a blunted affect and did not elaborate in her answers. She reported being in special

-9-

education classes because she was "slow." Tr. at 924. Dr. El-Sayegh recommended she continue Lexapro and recommended weekly individual counseling. Tr. at 925. Diagnoses were anxiety disorder, not otherwise specified and borderline intellectual functioning. Plaintiff was assigned a GAF score of 50. Tr. at 924-925.

Plaintiff was treated by Dr. Drublionis for sinusitis on November 15, 2010. Tr. at 906. On December 28, 2010, Dr. Drublionis saw the claimant for regular check-up on her depression, allergies, urinary incontinence, chronic obstructive pulmonary disease/asthma, lumbar spine degenerative disc disease and lumbago/severe pain, insomnia, and dyslipidemia. Tr. at 905. On August 2, 2011, Dr. Drublionis noted Plaintiff presented with multiple complaints, including severe mid to lower back pain, for which she was prescribed Percocet. Tr. at 951.

Plaintiff was seen for counseling by Patricia Richmond, PC, on a regular basis beginning September 13, 2010 for treatment of depression and improved coping skills. Tr. at 913-927. On a panic and anxiety disorder questionnaire, completed on June 15, 2011, Ms. Richmond reported she had been counseling Plaintiff two times per month. Tr. at 932. Ms. Richmond indicated that Plaintiff had been observed to be depressed; to have feelings of guilt or worthlessness; and to have difficulty handling stress. Tr. at 932. Further, she estimated Plaintiff would have a panic attack about once a month and that her activities of daily living were markedly restricted by her mental issues. Tr. at 932. Marked was defined as "serious limitation, severely limit[ing] the ability to function (i.e. on task 48%-82% in an eight-hour workday.")

Ms. Richmond noted Plaintiff had shown signs of recurrent and intrusive recollections of traumatic experiences which were a source of marked distress and that she had a marked degree of limitation in the ability to maintain social functioning and to interact appropriately with the general public. Tr. at 933. Ms. Richmond commented that due to discussions and processing Plaintiff's previous traumas, she had noticed "issues with anxiety." Plaintiff had reported issues with depression that prevented her from being able to perform activities of daily living. Tr. at 933.

On a third-party questionnaire, Ms. Richmond reported symptoms included loss of interest in almost all activities, feelings of guilt or worthlessness, and decreased energy. Tr. at 936. She

reiterated her opinion that Plaintiff had marked limitations in activities of daily living and marked limitations in social functioning. Tr. at 937.

On a sleep disorder questionnaire, Ms. Richmond noted Plaintiff had nightmares which affected her sleep. Tr. at 938. Associated symptoms were drowsiness, extreme fatigue, and depression. Tr. at 938. Ms. Richmond opined that Plaintiff's depression hindered her from taking care of herself due to lack of motivation to complete activities of daily living. Tr. at 939. It was noted Plaintiff had difficulty staying focused and could get off task repeatedly, and that she did have difficulty interacting with others. Tr. at 939.

On July 1, 2011, Dr. Drublionis reported he was treating the claimant for degenerative disc disease in the mid and lower thoracic spine and degenerative changes in the lumbar spine. Tr. at 929. Plaintiff had reported back pain, and he had observed middle and lower back tenderness. Tr. at 929. Dr. Drublionis opined the pain was of an intensity and persistence that affected Plaintiff's ability to do work-related activities due to pain with lifting and bending. Tr. at 929. He also noted she had depression as a possible psychological component Tr. at 929. Dr. Drublionis felt her pain would frequently be severe enough to interfere with attention and concentration. Tr. at 929.

On July 20, 2011, Dr. El-Sayegh, completed a functional assessment in which he reported Plaintiff's diagnosis was anxiety disorder. Tr. at 944. On the five point scale of none, mild, moderate, marked, and extreme,[2] Dr. El-Sayegh opined Plaintiff had an extreme degree of restriction of daily activities; e.g., the ability to attend meetings (church, etc.), socialize with friends/neighbors, etc. Tr. at 943. Dr. El-Sayegh opined she had a moderate degree of restriction in the areas of ability to relate to other people; ability to maintain concentration and attention for extended periods; and the ability to perform activities within a schedule, maintain regular attendance, and be punctual. Tr. at 943. Additionally, she was found to have moderate limitations in the ability to respond appropriately to supervision, co-workers, customary work pressures, to changes in the work place,

---

[2]The assessment defined moderate as a "significant limitation (i.e. on task 82% - 88% in an eight-hour work day)," and extreme as a "major limitation with no useful ability to function (i.e. on task 0% -48% in an eight-hour work day."

-11-

to perform complex, repetitive or varied tasks, and to behave in an emotionally stable manner. Tr. at 943-944.

Dr. El-Sayegh opined that these limitations had been present since at least December 28, 2009 and that her condition would likely deteriorate if she was placed under stress, especially that of a job. Tr. at 944. Finally, Dr. El-Sayegh opined that on average the claimant could be anticipated to be absent from work more than three times a month. Tr. at 944.

On October 10, 2011, Ms. Richmond noted Plaintiff still had days where she was sad and upset.  Tr. at 1043. It is important to note that the ALJ did not consider the treatment records summarized from this point forward because notes were generated after the hearing. The additional information was made a part of the record before the Appeal Council.  Plaintiff was seen by Dr. El-Sayegh on October 25, 2011, for a medication check, at which time she reported she felt better, but she still occasionally got anxious or upset with others.  Tr. at 1042. She was instructed to continue on Lexapro. Tr. at 1042.

Plaintiff had her initial visit with Tracy Picard, QMHS, on December 2, 2011. Tr. at 1033. When seen for medication check by Dr. El-Sayegh on December 22, 2011, she had a constricted affect and she reported having occasional crying spells. Tr. at 1029. She was to continue on Lexapro and Celexa was started. Tr. at 1029.

On March 7, 2012, Dr. El-Sayegh noted Plaintiff had not been taking Lexapro and had been more down, depressed, and anxious. Tr. at 1020. She did not like Celexa and wanted to return to Lexapro. Tr. at 1020. She had a constricted affect. Tr. at 1020. She saw Dr. El-Sayegh again on April 12, 2012, at which time she was doing better on Lexapro, but she continued to have some crying spells related to relationship problems with her boyfriend. Tr. at 1011. Dr. El-Sayegh noted her affect was blunted when seen on May 21, 2012, but she felt Lexapro was helping. Tr. at 1003. Plaintiff still experienced occasional anxiety and a depressed mood. Tr. at 1003.

On January 9, 2012, Plaintiff complained of shortness of breath, cough, and overactive bladder, and she was to continue on her medications for these problems. Tr. at 946.  She weighed 238 pounds. Tr. at 946. She weighed 247 pounds on February 7, 2012 and she was seen about once a month for follow-up and refills. Tr. at 64-69. On July 2, 2012, Dr. Drublionis prescribed

-12-

Oxybuynin for urinary incontinence and Percocet and Naprosyn for her degenerative disc disease of the lumbar spine. Tr. at 64.

Plaintiff was hospitalized at University Hospitals Case Medical Center from August 21, 2012, through September 21, 2012, due to left middle cerebral artery stroke, status post left frontotemporoparietal hemicraniectomy/duraplasty. On August 20, 2012; right-sided hemiplegia; dysphagia status post percutaneous endoscopic gastrostomy tube placement on August 15, 2012; spasticity; right lower extremities deep vein thrombosis involving the soleal vein; hypertension; and borderline diabetes mellitus. Tr. at 12. It was noted that Plaintiff was unresponsive at the time of admission and she had a history of left frontal stroke in 2000. Tr. at 12. At the time of discharge, Plaintiff was awake and alert, but she still had "significant expressive aphasia." Tr. at 12-13. During a central nervous system examination, Plaintiff still had right-sided hemiplegia and she required maximum assistance for dressing the lower extremities. Tr. at 13. Wheelchair mobility was recommended for home as she was very reliant on hand rails when walking. Tr. at 17.

Plaintiff's regular mental health treatment continued, and on August 24, 2012, it was reported Plaintiff had suffered a stroke. Tr. at 977. On October 8, 2012, Ms. Picard noted Plaintiff was unable to communicate clearly and the only word understood was "no." Tr. at 970. The stroke had affected the right side of her body and she was unable to hold a pen to sign her name on release forms. Tr. at 970. Plaintiff's daughter built a ramp to allow Plaintiff access to the house via wheelchair as she was not able to ambulate. Tr. at 970. She was still unable to respond with clarity other than saying "no" when telephone contact was made on October 10, 2012. Tr. at 967.

Dr. Drublionis noted on October 12, 2012, that Plaintiff was seen status post acute cerebrovascular accident status post craniotomy with right hemiparesis and prolonged hospitalization. Tr. at 62. On examination, she had right hemiparesis. Tr. at 62. Plaintiff requested prescriptions for adult diapers, cleansing wipes and wheelchair. Tr. at 62.

### **B.** **State Agency Assessments**

On March 10, 2010, W. Jerry McCloud, M.D., a State agency medical consultant, reviewed the record and found that Plaintiff did not have a physical impairment that could be considered "severe," specifically stating there was no evidence of a stroke in August 2009, and no Medical

-13-

Source Statement to assign weight. Tr. at 722. These findings were affirmed upon reconsideration by another State agency medical consultant, Cindi Hill, M.D., on June 9, 2010. Tr. at 742.

On March 11, 2010, a State agency medical consultant, Vicki Warren Ph.D., concluded that Plaintiff was capable of simple repetitive tasks with few changes, no strict production quotas, and limited interaction with others Tr. at 725. Dr. Warren discredited the opinion of consultative examiner, Dr. Halas, by saying the marked limitations were inconsistent with the claimant's ability to obtain a driver's license, shop, care for her children, cook, and maintain friendships. Tr. at 725. Severe impairments considered included dementia not otherwise specified; depressive disorder, not otherwise specified; borderline intellectual functioning; and anxiety disorder, not otherwise specified and she was assessed no more than moderate limitations in maintaining social functioning and in maintaining concentration persistence or pace. Tr. at 727-737. These findings were affirmed upon reconsideration by another State agency medical consultant, Jennifer Swain, Psy.D., on June 4, 2010 Tr. at 741.

### C.      Hearing testimony

At the hearing, Plaintiff testified that she relied upon her middle child's disability benefits to pay her monthly bills, but that when her middle child reached eighteen years of age, she moved from Plaintiff's home to live with a friend. Tr. at 86-87. Plaintiff's youngest daughter[3] was taken in by the same friend because Plaintiff lost her source of household income. Plaintiff currently lives with her father. Tr. at 88. Plaintiff cooks for her father, but he cleans the house and washes the laundry. Tr. at 89. Plaintiff is able to drive, but does not own a car.

Plaintiff arises at 5:00 or 6:00 a.m. and does "[m]ainly, nothing really" all day. Tr. at 89. She sits for twenty minutes here and there and then walks around the house to ease her back pain. Tr. at 90.

When asked why she cannot work, Plaintiff said that she does not have the strength she once had in her right side. Tr. at 90. She further testified that she had not worked since she suffered the stroke in 2008. Tr. at 91. Although she can still write with her right hand, Plaintiff has difficulty

---

[3]Plaintiff's oldest daughter is twenty one years of age and no longer lives at home

holding heavy things, for example, a gallon of milk, with her right hand. When asked for additional reasons why she cannot work, Plaintiff responded, "That's all I can think of right now." Tr .at 92.

Plaintiff testified that she experiences greater difficulty understanding things since she suffered the stroke in 2008. Tr. at 96. She further testified that she could not handle the pressures and demands of a work place. Tr. at 97. Plaintiff cries three or four times per day. Tr. at 98. She testified that she often cries for one or two hours, and sometimes she cries all day. Lexapro sometimes helps Plaintiff function. Tr. at 99.

At the hearing, Plaintiff testified that she has breathing problems and that she struggles with urinary incontinence. Tr. at 100. She further testified that she experiences ten incidents of urinary incontinence per day. Despite her breathing problems. Plaintiff smokes one pack of cigarettes per day. Tr. at 102.

### D.     The ALJ's Decision

The ALJ determined that the longitudinal evidence in the record did not support the various conclusions that Plaintiff had marked limitations in her ability to perform her daily activities of living.[4] The ALJ relied upon Plaintiff's testimony at the hearing, as well as a functional report dated May 18, 2010, to show that Plaintiff was only moderately impaired in her ability to perform her activities of daily living. In the functional report, Plaintiff wrote that she visits friends, cleans her home, watches television, attends her children's softball games, cares for her children and the family dog. Tr. at 402. At the hearing, Plaintiff testified that she cooked meals for her father.

Based upon the foregoing evidence, the ALJ dismissed Plaintiff's IQ scores and GAF scores (which she characterized as "snapshot[s] in time") because they were not indicative of Plaintiff's "general psychological functioning." Tr. at 156. Instead, the ALJ gave great weight to the opinion of file reviewing physician, Dr. Warren, who opined that Plaintiff retained the ability to perform simple, repetitive tasks involving few changes and limited interaction with others, in a work environment free from strict production quotas. The ALJ found that Dr. Warren's opinion was consistent with the medical evidence as a whole.

---

[4]Plaintiff does not challenge the ALJ's conclusions with respect to her physical impairments.

-15-

In crediting Dr. Warren's opinion, the ALJ gave little weight to the opinion of Dr. El-Sayegh. Dr. El-Sayegh opined that Plaintiff's had extreme limitations with her activities of daily living and opined that she would likely be absent from work at least three days per month. The ALJ wrote, "[Dr. El-Sayegh's] statement regarding [Plaintiff's] activities of daily living runs contra to her actual abilities. However, his remaining findings (moderate limitations in all other areas) support several of the limitations contained within the above residual functional capacity." Tr. at 157.

The ALJ likewise gave little weight to the opinion of consulting examiner, Dr. Halas. Dr. Halas opined that Plaintiff was markedly limited in her abilities to understand, remember, and follow instructions, relate to others, maintain attention and concentration to perform simple repetitive tasks, and withstand the stress and pressures associated with day-to-day work. The ALJ opined that Dr. Halas' opinion was "completely inconsistent with the record," citing Plaintiff's ability to perform her activities of daily living. Tr. at 157. Dr. Halas' opinion is also at odds with the opinion of the treating physician, Dr. El-Sayegh, who found only moderate limitations in the foregoing areas.

The ALJ also rejected Ms. Richmond's opinion that Plaintiff has marked limitations with her activities of daily living and social functioning. Because Ms. Richmond's opinion was "so inconsistent with the record," the ALJ also likewise afforded little weight to Ms. Richmond's arthritis and sleep disturbance questionnaires. Tr. at 157.

### E.    Treating Physician Rule

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544. A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers, supra*, at 243 (6th Cir. 2007). If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.' " *Wilson v. Commisioner of Social Security,* 378 F.3d 541, 544 (6th Cir.2004) quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers v. Commisioner of Social Security,* 486 F.3d 234, 243 (6th Cir.2007), citing *Wilson*, 378 F.3d at 544.

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. *Id.* citing 20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion. *Id.* citing §404.1527(c)(6).

In *Gayheart*, the Sixth Circuit recognized that conflicting substantial evidence must consist of "more than the medical opinions of the nontreating and nonexamining doctors." The Sixth

-17-

Circuit reasoned that "[o]therwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion." *Gayheart* at 377. However, "[t]he determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.1985).

Plaintiff contends that the ALJ erred in giving little weight to the opinion of Dr. El-Sayegh regarding Plaintiff's alleged inability to maintain proper attendance at work. The ALJ rejected Dr. El-Sayegh's opinion because there was no evidence in the record to show that Plaintiff had attendance problems in her past work or with medical appointments. Of equal import, Dr. El-Sayegh's opinion was at odds with his own functional assessment that Plaintiff's anxiety disorder created only moderate limitations with respect to her ability to relate to other people; ability to maintain concentration and attention for extended periods; and the ability to perform activities within a schedule, maintain regular attendance, and be punctual. Tr. at 943. Additionally, Dr. El-Sayegh concluded that Plaintiff had moderate limitations in the ability to respond appropriately to supervision, co-workers, customary work pressures, to changes in the work place, to perform complex, repetitive or varied tasks, and to behave in an emotionally stable manner Tr. at 943-944.

The only area is which Dr. El-Sayegh assessed extreme restriction was in Plaintiff's activities of daily living. However, the ALJ properly concluded that the evidence in the record contravened Dr. El-Sayegh's opinion regarding Plaintiff's ability to perform her activities of daily living. Therefore the ALJ did not err in giving little weight to Dr. El-Sayegh's opinion regarding Plaintiff's ability to regularly attend at work.

### F.    ODJFS Finding of Disability

Social Security Ruling ("SSR") 06-03p reads, in pertinent part:

Under sections 221 and 1633 of the Act, only a State agency or the Commissioner can make a determination based on Social Security law that you are blind or disabled. Our regulations at 20 CFR 404.1527(e) and 416.927(e) make clear that the final responsibility for deciding certain issues, such as whether you are disabled, is reserved to the Commissioner (see also SSR 96-5p, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner"). However, we are required to evaluate all the evidence in the case record that may have a bearing on our determination or decision of disability, including decisions by other

-18-

> governmental and nongovernmental agencies (20 CFR 404.1512(b)(5) and 416.912(b)(5)).
>
> Therefore, evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered. These decisions, and the evidence used to make these decisions, may provide insight into the individual's mental and physical impairment(s) and show the degree of disability determined by these agencies based on their rules. We will evaluate the opinion evidence from medical sources, as well as "non-medical sources" who have had contact with the individual in their professional capacity, used by other agencies, that are in our case record, in accordance with 20 CFR 404.1527, 416.927, Social Security Rulings 96-2p and 96-5p, and the applicable factors listed above in the section "Factors for Weighing Opinion Evidence."
>
> Because the ultimate responsibility for determining whether an individual is disabled under Social Security law rests with the Commissioner, we are not bound by disability decisions by other governmental and nongovernmental agencies. In addition, because other agencies may apply different rules and standards than we do for determining whether an individual is disabled, this may limit the relevance of a determination of disability made by another agency. However, the adjudicator should explain the consideration given to these decisions in the notice of decision for hearing cases and in the case record for initial and reconsideration cases.

SSR 06-03p, 2006 WL 2329939. (Emphasis added). When evaluating the opinions of other agencies, including determinations made by the Ohio Department of Jobs and Family Services, an ALJ must explain the weight given to the opinion of the source or ensure that the discussion of the evidence allows a subsequent reviewer to follow the ALJ's reasoning if the opinion may have an effect on the outcome of the case. See *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007).

On October 19, 2010, Plaintiff was found to meet the requirements of Listing 3.02B for chronic pulmonary insufficiency since August 10, 2010, by the County Medical Services Unit of the Ohio Department of Jobs and Family Services. Tr. at 886-887. At the hearing, the ALJ acknowledged the ODJFS finding, but explained that she was not bound by the state agency decision.

The Listings are a regulatory device used to streamline the decision-making process by identifying claimants whose medical impairments are so severe that they would be found disabled regardless of their vocational background. 20 C.F.R. § 416.925(a); *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). The medical criteria defining the listed impairments are appropriately set at a higher level than the statutory standard for disability. *Zebley*, 493 U.S. at 528-532. To be found

presumptively disabled, a claimant must show that all of the criteria for a listing have been met. 20 C.F.R. § 416.925(c)(3) (emphasis added); *Zebley*, 493 U.S. at 530. Plaintiff bears the burden of proof to present evidence that an impairment or combination of impairments meets or equals a listed impairment by presenting medical findings equal in severity to all the criteria for the one most similar listed impairment. 20 C.F.R. § 416.926; *Zebley*, 493 U.S. at 531.

Here the ALJ specifically considered Listing 3.02 and found that Plaintiff did not meet the criteria. With regard to Listing 3.02, the ALJ noted that the record failed to demonstrate the FEV1, FCV, single breath DLCO, arterial blood gas, or P02 values necessary to satisfy the requirements of Listing 3.02. Tr. at 154. The ALJ further acknowledged that no physician of record opined that Plaintiff met or equaled Listing 3.02 or any other Listing. Plaintiff has not met her burden of demonstrating that this analysis was in error; rather she merely points to another government agency's finding with no medical analysis.

Listing 3.02(B) provides that Plaintiff, given her height of 67 inches, would need an FVC equal to or less than 1.55. However, Plaintiff's pulmonary function test showed that she had an FEVI which was 1.76 L (55% predicated), and her FVC pre was 2.64 and post was 2.60.Tr. at 866, 869; 20 C.F.R. Part 404, Subpart P., App. 1, Listing 3.02B. Plaintiff has offered no evidence that shows that she had an FVC equal to or less than 1.55 or that the condition lasted for twelve months or more. Accordingly, even assuming *arguendo* that the ALJ erred in not addressing the ODJFS finding in the Decision, it was harmless, as it would not have changed the outcome based on the evidence of record.

## VI.  CONCLUSION

For the foregoing reasons, the Commissioner's decision is AFFIRMED and Plaintiff's complaint is DISMISSED with prejudice.

DATE: September 29, 2014

                                           */s/George J. Limbert*
                                           GEORGE J. LIMBERT
                                           UNITED STATES MAGISTRATE JUDGE